1
2
3
4
5
6
7

8                IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10  THERESA HOLBROOK KRAFT, et al.,

11            Plaintiffs,              No. CIV S-04-0129 GGH

12      vs.

13  SHANNON LANEY, et al.,

14            Defendants.             <u>ORDER</u>

15  _____/

16           Previously pending on this court's calendar for July 21, 2005 was plaintiffs'

17  motion for partial summary judgment against Barton Healthcare System ("Barton"), defendant

18  County of El Dorado ("El Dorado") and Sergeant Don Atkinson's motion for summary judgment

19  and/or partial summary judgment, and Barton Healthcare System's motion for summary

20  judgment or summary adjudication.[1]  Amitai Schwartz appeared on behalf of plaintiffs.  Thomas

21  Perry and Allison Lafferty appeared for Barton.  Franklin Gumpert appeared for the County of El

22  \\\\\

23  \\\\\

24  ─────────────────

25      [1] On the day prior to the hearing, plaintiffs' counsel communicated to chambers that the
parties had come to an agreement regarding their motion to exclude at trial testimony of South
26  Lake Tahoe ("SLT") defendants' expert Don Cameron, and it would be withdrawn.

1

1  Dorado and Sergeant Atkinson.  Richard Creeggan represented the South Lake Tahoe

2  defendants.[2]

3  I. BACKGROUND

4          This case is proceeding on the first amended complaint, filed August 20, 2004.

5  Plaintiffs are Paul Kraft's widow and children who claim that after Kraft crashed his car into a

6  snowbank on April 4, 2003, police arrested him for driving and being under the influence of a

7  controlled substance.  They transported him to Barton Hospital for a blood test where he stopped

8  breathing and underwent cardiac arrest.  He died the next day.  Plaintiffs claim that actions by

9  South Lake Tahoe Police and an El Dorado County deputy sheriff (sergeant) in arresting Kraft

10  and applying excessive force, as well as lack of medical attention by police and Barton, caused

11  his death.  Plaintiffs claim that defendants should have medically screened him to determine he

12  had serious medical needs.  Present defendants are County of El Dorado, Sergeant Don Atkinson,

13  Officers Deanna Lewis, Shannon Laney, Mark Gentle, Schyler Beaty, the City of South Lake

14  Tahoe, and Barton Healthcare System.

15          The first amended complaint contains claims for violation of plaintiffs' civil rights

16  under 42 U.S.C. § 1983, including substantive due process rights, Fourth Amendment for

17  excessive force[3] and deliberate indifference to medical needs, right to familial association,

18  unlawful custom, practice and policy by South Lake Tahoe which caused Kraft's death, violation

19  of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), and state law claims

20  of negligence, failure to summon medical care, and violation of Cal. Health and Safety Code §

21

22          [2]  The SLT defendants filed non-oppositions to the motions of Barton and El Dorado, and made no argument at hearing.

23

24          [3]  The first amended complaint uses the term "unreasonable seizure," but the court understands plaintiffs to mean "excessive force" insofar as they are alleging the facts and circumstances up to their decedent's placement in the blood drawing room.  Under no

25  conceivable interpretation of the facts was plaintiff "unreasonably seized" when first arrested by the South Lake Tahoe officers as that term is known in Fourth Amendment jurisprudence.  See,

26  United States v. Williams, – F.3d –, 2005 WL 1950006 (9th Cir. 2005).

1317 et seq.  Plaintiffs seek compensatory and punitive damages.

II. SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment avoids unnecessary trials in cases with no disputed material facts.  See Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  Two steps are necessary.  First, according to the substantive law, the court must determine what facts are material.  Second, in light of the appropriate standard of proof, the court must determine whether material factual disputes require resolution at trial.  See id. at 248, 106 S. Ct. 2510.

When the opposing party has the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim.  See e.g., Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 3187 (1990).  When the opposing party has the burden of proof, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue.  See Celotex v. Cattret, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553 (1986).

If the moving party meets its burden, the burden shifts to the opposing party to establish genuine material factual issues.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).[4]  The opposing party must demonstrate that disputed facts are material, i.e., facts that might affect the outcome of the suit under the governing law, see Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e., the

---

[4]  The nonmoving party with the burden of proof  "must establish each element of his claim with significant probative evidence tending to support the complaint."  Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).  A complete failure of proof on an essential element of the nonmoving party's case renders all other facts immaterial, and entitles the moving party to summary judgment.  Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

1  parties' differing versions of the truth require resolution at trial, see T.W. Elec., 809 F.2d at 631.

2  The opposing party may not rest upon the pleadings' mere allegations or denials, but must present

3  *evidence* of specific disputed facts.  See Anderson, 477 U.S. at 248, 106 S. Ct. 2510.[5]  Conclusory

4  statements cannot defeat a properly supported summary judgment motion.  See Scott v.

5  Rosenberg, 702 F.2d 1263, 1271-72 (9th Cir. 1983).

6          The court does not determine witness credibility.  It believes the opposing party's

7  evidence, and draws inferences most favorably for the opposing party.  See Anderson at 249, 255,

8  106 S. Ct. at 2510-11, 1513.  Inferences, however, are not drawn out of "thin air," and the

9  proponent must adduce evidence of a factual predicate from which to draw inferences.  American

10 Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J.,

11 dissenting) (citing Celotex, 477 U.S. at 322, 106 S. Ct. at 2552).

12         If reasonable minds could differ on material facts at issue, summary judgment is

13 inappropriate.  See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995).  On the other

14 hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

15 nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct.

16 1356 (citation omitted).  In that case, the court should grant summary judgment.

17 III.  DEFENDANTS ATKINSON'S AND EL DORADO COUNTY'S OBJECTIONS TO

18 PLAINTIFFS' EVIDENCE

19         The El Dorado County defendants object to specific evidence proffered by

20 plaintiffs, including portions of the Rule 26 statements attached to the declarations of Paul

21 Hermann, M.D. and Benjamin Lerman, M.D., and portions of the depositions of Lisa Hudson and

22 Shannon Laney.

23 \\\\\

24

25         [5]  A verified complaint may be used as an affidavit in opposition to the motion.
   Schroeder v McDonald, 55 F. 3d 454, 460 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196,
26 197-98 (9th Cir. 1987) (per curiam).

1      A.  <u>Hermann and Lerman Statements</u>

2      These statements are not relevant in determining Atkinson's motion for summary

3 judgment because they relate to Kraft's medical condition and care involved, and the court has

4 determined that Atkinson's involvement was minimal.  <u>See</u> discussion *infra*.

5      B.  <u>Hudson Deposition</u>

6      The objections are to Hudson's testimony that the officers applied force to hold

7 Kraft down and the degree of force applied which Hudson described as "extreme."  (Hudson

8 Depo. at 24-25.)

9      This testimony is not relevant to the basis for determining Atkinson's motion for

10 summary judgment due to Atkinson's non-involvement at the time.  <u>See</u> discussion *infra*.

11      In any event, on reading the Hudson testimony at the cited pages, the word

12 "extreme" does not mean "excessive," but rather, that much force in the physics sense was used

13 "because he was extremely combative."  All this testimony does is prove one of Newton's laws of

14 physics:  for every action there is an equal and opposite reaction.  "Extreme" pushing force was

15 used in order to hold down a person exhibiting "extreme" combativeness.  Nothing in Hudson's

16 deposition fairly indicates that the force used was greater than that necessary to control the

17 situation, or that the force was painful or injurious in any respect.

18      C.  <u>Laney Deposition</u>

19      Defendants object to the following portions of Laney's deposition.

20      A.  There was some discussion before I opened the door of how we

21      were going to get him and how we were going to handle the call, or

22      how we were going to handle <u>the situation</u>.  So I didn't just jump

23      into it.  We discussed it and then I opened the door.

24 (Laney Depo. at 77:2-5.)

25      Q.  Okay.  So who was in that first huddle?

26      A.  Sergeant Atkinson was there and Deputy Wright was there.

1           Reserve Officer Gentle, Officer Lewis and Officer Beaty were all

2           there by the door talking about <u>it</u>.

3 (<u>Id.</u> at 77:19-23.)

4           Q.  You were sort of <u>working as a team</u> at that point?

5           A.  Yes.

6 (<u>Id.</u> at 78:6-8.)

7           Q.  So in that five to ten minutes, you were sort of figuring out the

8           plan of how to deal with this; correct?

9           A.  In that time we were waiting for the other officers to arrive, and,

10           yes, we were kind of formulating a plan on how to deal with <u>the</u>

11           <u>situation</u>.

12 (<u>Id.</u> at 79:21- 80:1.)

13       Defendants object to the underlined terms as conclusory, speculative, and lacking

14 foundation.  This testimony is pertinent to Atkinson's involvement and motion.  Nevertheless, the

15 terms used, when taken in context with the remainder of the deposition are not objectionable.

16 Defendants' objections in this regard are overruled.

17 IV.  <u>DEFENDANT BARTON'S OBJECTIONS TO PLAINTIFFS' EVIDENCE</u>

18      A.  <u>Hermann and Lerman Statements</u>

19       Barton objects to the statements attached to these experts' declarations as

20 inadmissible because they constitute unsworn expert opinion, and contain hearsay and irrelevant

21 conclusions.  These statements are not relevant to the parties' motions regarding whether Barton

22 was a state actor, and whether EMTALA and its state law equivalent apply.  These expert

23 statements are relevant to plaintiffs' 42 U.S.C. § 1983 claim, and are adequate as submitted for

24 summary judgment.  Defendant's objections are overruled.

25 \\\\\

26 \\\\\

B.  Barton's Objections to Plaintiffs' Responses to Its Statement of Undisputed Facts

Barton has set forth a series of its undisputed facts which it claims plaintiffs improperly dispute with supporting evidence which Barton claims misconstrues the undisputed facts and at times are blatant misstatements.  The objections attempt to demonstrate how plaintiffs' supporting evidence does not really dispute the fact it purports to dispute.  The court has reviewed Barton's objections, plaintiffs' disputes and the record in deciding the motions.  It will not make a separate ruling on each objection.

V.  DEFENDANTS EL DORADO COUNTY AND ATKINSON'S MOTION FOR SUMMARY JUDGMENT

The South Lake Tahoe Defendants and Barton Healthcare System have filed non-oppositions to this motion.

Plaintiffs' allegations against Atkinson and the County of El Dorado are cast in three main areas: (1) the force used to transport plaintiffs' decedent into the hospital;  (2) the force used to restrain Kraft in the hospital; and (3) the alleged inaction on the part of Atkinson to ensure that a medical screening was done "first" as opposed to a blood draw.  The first two areas are governed by the Fourth Amendment, the last is governed by the Fourteenth Amendment (substantive due process).

A.  Facts Regarding Atkinson's Involvement in the Incident[6]

The undisputed facts concerning Kraft's behavior are as follows.  After Kraft drove his vehicle into the snowbank, bystanders who had personal experience with drugs approached, and thought that Kraft had taken a hallucinogen.  They observed him to be nervously moving his hands, and talking about dogs coming after him.  When Officer Lewis arrived, she thought that Kraft was hallucinating about dogs coming after him.  He complied with her pat down search.  During the time that Lewis transported Kraft to Barton Hospital, he became verbally abusive, and

_____

[6]  The facts set forth here are undisputed except where specifically summarized as disputed.

1   was kicking out in the police car.  By the time the patrol car arrived at the hospital, it was rocking

2   to and fro as a result of Kraft's kicking, frightening the nurse who came to greet the car.  Kraft

3   continued to yell, scream and kick the window while in the vehicle which was parked in the

4   carport outside the emergency room.  During the time that Atkinson went to one side of the car

5   and opened the door, Kraft continued to yell and kicked his feet out near Atkinson's stomach.

6   After Kraft's legs were cuffed, he continued to kick them at medical personnel.  While being

7   wheeled into the hospital on the gurney, Kraft continued screaming and kicking.  It is disputed

8   whether he was also spitting.  He appeared angry and wanting to get away.  Kraft continued to

9   thrash about after being deposited in lab room 5.  After Atkinson left this room, Officer Beaty sat

10  on Kraft's legs because they were still going wild.  According to medical staff Jamie Dillon, Kraft

11  was one of the most physically resistive persons ever to come in for a blood draw.

12          Atkinson was not involved in Kraft's arrest, but became involved as a result of a

13  radio call without a request for assistance, but to which he responded "in case they needed

14  additional help."  At Barton Hospital Atkinson began his involvement when he helped to get Kraft

15  out of the police vehicle by holding down his feet so he couldn't kick.  There was a huddle of

16  officers in which he took part to determine how to get Kraft out of the vehicle.  It is disputed

17  whether Atkinson had any input or decisionmaking influence.  Lewis stated that it was her

18  decision to keep shackles and handcuffs on Kraft and that she was not influenced by any

19  suggestion or recommendation Atkinson may have made.  Lewis Depo. at 342:5-13.  Atkinson

20  also helped place leg cuffs on Kraft's feet after being directed to move to the other side of the

21  vehicle for this purpose by Officer Laney.  Other officers held Kraft's upper body and pulled him

22  out of the vehicle onto a gurney.  The decision was made to transport Kraft in this way pursuant to

23  a consensus among the officers present, although Laney stated that she took the lead because Kraft

24  was the SLTPD's arrestee and El Dorado County Sheriff's Department was only there to assist.

25  Laney Depo., Exh. FF at 78.  After placing the leg cuffs on Kraft's feet, Atkinson did not touch

26  Kraft until he was in room 5 of the hospital.

8

B. <u>Fourth Amendment - Excessive Force (Unreasonable Seizure)</u>

At the outset, it should be noted that although ¶ 48c of the first amended complaint alleges violations of the due process clause of the Fourteenth Amendment, "[w]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" <u>Albright v. Oliver</u>, 510 U.S. 266, 273, 114 S. Ct. 807, 813, (1994) (plurality opinion) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, (1989)).  Accordingly, the court has not considered plaintiffs' bare substantive Fourteenth Amendment claim, in light of the Fourth Amendment's specific protection against unreasonable searches and seizures, and the lack of factual allegations in the complaint to support other theories of constitutional protection.

Under the Supreme Court's ruling in <u>Graham v. Connor</u>, 490 U.S. 386, 397, 109 S. Ct. 1865, 1972, 104 L.Ed.2d 443 (1989), the appropriate frame of reference for the determination of excessive force arrest cases is the Fourth Amendment "reasonableness" standard, that is, "whether the officers' action are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Evidence of evil intent or sadistic motive has "no proper place in [the] inquiry."  <u>Id</u>. at 1873.

In <u>Saman v. Robbins</u>, 173 F.3d 1150, 1156 (9th Cir. 1999), the court found that based on the undisputed evidence that the officer delivered a single kick to subdue the arrestee under tense circumstances where an officer had been shot during a gun battle, the evidence was insufficient as a matter of law to support a jury's verdict of liability under § 1983 or state battery. <u>See</u> <u>also</u> <u>Mendoza v. Block</u>, 27 F.3d 1357, 1362-63 (9th Cir. 1994) (officer's use of police dog who inflicted several bites and held onto suspect was objectively reasonable where robbery suspect was thought to be armed); <u>Forrester v. City of San Diego</u>, 25 F.3d 804, 807 (9th Cir. 1994) (pain compliance techniques causing bruises, pinched nerve and broken wrist on abortion protesters who were not resisting were objectively reasonable); <u>Saucier v. Katz</u>, 533 U.S. 194,

209, 121 S. Ct. 2151, 2160 (2001) (force used to half-walk, half-drag protester from scene of Vice-President's speech and shove or throw him into military van was not excessive). Atkinson's actions, when viewed in the light most favorable to plaintiffs, although admittedly not involving the same degree of exigent circumstances present in Mendoza and Forrester, do not come close to the force described by the Ninth Circuit as objectively unreasonable given the circumstances here of a wildly acting-out arrestee.

This is not to say that a police officer can escape liability simply because "he sits back and does nothing" to further the excessive force. Inactivity in the face of circumstances in which the reasonable police officer would know that he needed to take steps to avoid the use, or continued use, of excessive force on a detainee will lead to liability. Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003). Nor does one have to be a supervisor in order to obtain this type of "inactivity" liability. See Fundiller v. Cooper City, 777 F.2d 1436, 1441-1442 (11th Cir.1985) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force ... can be held liable for his nonfeasance."); Webb v. Hiykel, 713 F.2d 405, 408 (8th Cir.1983) (concluding that an officer has "a duty to prevent the use of ... force, even if the officers beating [the victim] were [the officer's] superiors"); Ware v. Reed, 709 F.2d 345, 353 (5th Cir.1983) (concluding that an "instruction on the defendant's alleged acquiescence in the unconstitutional conduct of other officers should have been given"); Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir.1982) (concluding "that it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff"); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir.1972) (stating that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge" and that this responsibility exists "as to nonsupervisory officers who are present at the scene of

such summary punishment").

But the facts and circumstances of Kraft's transport into the medical facility do not give rise to any liability, passive or active. Plaintiffs strenuously argue that Kraft required urgent medical treatment, or at least screening; the South Lake Tahoe officers wanted to have a blood draw. Under either intention, Kraft, who was at best an unruly, combative detainee, was not going into the facility in the absence of force. And, police officers have to exert enough force so that the wildly thrashing person understands who is in control of the situation. Common sense informs us that inadequate exhibitions of control by police officers can lead to situations where the detainee begins to understand (erroneously) that he is in control thereby escalating his misconduct to the point where more deleterious forms of force have to be used. There simply is no fact presented which suggests that the rather mild force, causing no apparent physical injury whatsoever, used to transport the drug intoxicated Kraft into the medical facility was excessive.

The same result obtains for Atkinson's minimal involvement in restraining Kraft while he was in Room 5 (the blood drawing room). The undisputed facts show that Kraft was still straining and thrashing wildly while in the room. Kraft was characterized by the medical personnel as the most physically resistive person who had ever come in for a blood draw. At all times, Kraft was in the actual custody of the South Lake Tahoe officers. While a South Lake Tahoe officer tried to calm him down through talking, such had no effect. Atkinson initially entered Room 5 to assist in holding Kraft's legs down. But he left after approximately two minutes. The phlebotomist required a "non-moving target" in order to draw blood, and further restraint was necessary. A South Lake Tahoe officer therefore sat on Kraft's thrashing legs holding his thighs in a stationary position. Some type of cover for the purpose of "blindfolding" Kraft was utilized by a South Lake Tahoe officer after Atkinson had left the room. Atkinson never suggested that a spit shield or cover be placed on Kraft while he was either inside or outside of the room. At some point Kraft was on his stomach; no evidence suggests that Atkinson, from his partially blocked vantage point outside the room understood that Kraft was experiencing

11

1 breathing difficulties until the persons in Room 5 noticed and caused a Code Blue to be called.

2 Before the Code Blue was called, Atkinson had been outside Room 5 for one to five minutes.

3         Given these circumstances, no reasonable officer would have believed that his

4 holding of the legs for a few minutes constituted excessive force.  No reasonable officer, from

5 partially observing the activities in Room 5 from outside the room, would have believed that the

6 restraint activities were excessive to the point where the outside intermittent observer would have

7 concluded that intervention had to take place.  This is so especially because medical personnel

8 were in the room, and one could reasonably have expected these medical personnel to object to

9 any restraint measures excessive to the need to keep Kraft still, or to be cognizant of any actions

10 which would cause health concerns.

11         C.  <u>Deliberate Indifference to Serious Medical Needs</u>

12         Atkinson argues that as a matter of law he did not display deliberate indifference

13 because other witnesses and even medically trained personnel did not think Kraft showed any

14 signs of injury or behavior which would lead one to think he needed medical care.

15         Plaintiffs argue that the hospital would not examine Kraft or perform a "fit for"

16 exam unless an officer requested it, and none did so.  Plaintiffs suggest that Atkinson should have

17 requested the exam.

18         Claims by arrestees are analyzed under the Fourteenth Amendment Due Process

19 Clause, rather than under the Eighth Amendment.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n. 16, 99 S.

20 Ct. 1861 (1979).  <u>Lolli v. County of Orange</u>, 351 F.3d at 418-19.  Because pretrial detainees'

21 rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth

22 Amendment, the same standards are applied.  <u>Redman v. County of San Diego</u>, 942 F.2d 1435,

23 1441 (9th Cir. 1991).  In order to state a § 1983 claim for violation of the Eighth Amendment

24 based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to

25 evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106,

26 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were

objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v.

Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853

(9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate

indifference."  Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

> In order to defeat summary judgment, under traditional Eighth
> Amendment standards used in Fourteenth Amendment claims such
> as this one, Lolli must show that he was (1) "confined under
> conditions posing a risk of 'objectively, sufficiently serious' harm"
> and (2) "that the officials had a 'sufficiently culpable state of mind'
> in denying the proper medical care." Clement v. Gomez, 298 F.3d
> 898, 904 (9th Cir.2002). [FN6] "A defendant is liable for denying
> needed medical care only if he 'knows of and disregards an
> excessive risk to inmate health and safety.'" Gibson, 290 F.3d at
> 1187.  "In order to know of the risk, it is not enough that the person
> merely 'be aware of facts from which the inference could be drawn
> that a substantial risk of serious harm exists, [ ] he must also draw
> that inference.' ... But if a person is aware of a substantial risk of
> serious harm, a person may be liable for neglecting a prisoner's
> serious medical needs on the basis of either his action or his
> inaction." Id. at 1188 (alteration in original).  "Prison officials are
> deliberately indifferent to a prisoner's serious medical needs when
> they deny, delay, or intentionally interfere with medical treatment."
> Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.2002) (internal
> quotation marks omitted).

Lolli v. County of Orange, 351 F.3d 410, at 418-419.

Also significant to the analysis is the well established principle that mere

differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

662 F.2d 1337, 1344 (9th Cir. 1981).

When Atkinson first heard the radio call by Officer Lewis which stated she was

taking an arrestee in, he heard Lewis state that she was "en route to Barton Hospital for either a

fit-for or blood draw, one of the two.  I don't recall which one." (Atkinson Depo. at 39:5-8.)  The

decision of how to proceed with Kraft was already made before Atkinson arrived on the scene.

He was not part of the decision to obtain a blood draw rather than a fit-for.  He also testified that

when he arrived at the hospital, he assumed Kraft was there to get a blood draw for drunk driving.

1    He made no assumption regarding whether he was also there for a "fit-for." (Id. at 49:16-24.)

2    Once Atkinson placed the shackles on Kraft's legs, he backed off so the other officers could take

3    Kraft out of the car. (Id. at 54.)  Atkinson assumed Officer Lewis was in charge because it was

4    standard practice for the officer who makes the call to be in charge of that call. (Id.)  This practice

5    would be maintained even if a responding officer like Atkinson held a higher position such as

6    sergeant. (Id.)  As Kraft was being wheeled into the hospital, Atkinson walked in behind the other

7    officers and behind the gurney, and could not hear what the other officers were talking about. (Id.

8    at 62.)  After Kraft was placed in room 5, it is undisputed that Atkinson held his feet down for

9    approximately two minutes, and then left the room without re-entering. (UF #23.)  After leaving

10   the room, Atkinson spoke with another officer and had only a partial view of the room.  It is

11   undisputed that Atkinson never saw Kraft having a difficult time breathing, hyperventilating or

12   gasping for air. (UF #44.)

13          Lolli, supra presents an interesting counterpoint to the situation here.  Lolli was a

14   diabetic who alleged excessive force and an ignoring of his medical needs as a diabetic.  Finding

15   that diabetes and possible insulin shock constituted a serious medical need, the issue before the

16   Ninth Circuit was whether the officers maintaining custody over Lolli had reason to know Lolli

17   was a diabetic and should have inferred from the circumstances before them that if Lolli did not

18   receive food, very untoward health events would occur.  Because Lolli directly told the officers of

19   his medical condition, his needs and deteriorating condition, the Ninth Circuit found issues of fact

20   both on the merits of the constitutional claim and for qualified immunity purposes as well.

21          The situation here is a far cry from Lolli.  While it may be true, as plaintiffs argue,

22   that drug or alcohol intoxication itself can lead to other serious medical conditions, the frequency

23   of such is by no means as well established for laypersons, or medical science, such that it can be

24   equated to the rather commonly well known hazard presented by a diabetic in dire need of food.

25   But most of all, Atkinson is in no way in the same position as the officers in Lolli.  Atkinson was

26   a peripheral officer—the officers with charge of Kraft's custody were the South Lake Tahoe

14

officers.  Most importantly, Kraft was in a *medical facility* where Atkinson would have the

expectation that medical personnel, working closely with the South Lake Tahoe officers, would

have the expertise to recognize a dangerous medical condition well ahead of the out-of-the-room

Atkinson.  It is not lost on the court that plaintiffs' case herein against the hospital derives in part

from the allegation that medical personnel should have advised against, or even overridden, any

taking of blood unless it was for a medical screening or treatment.  To find that a peripherally

involved deputy sheriff, with little knowledge of the facts that led up to Kraft's presence in the

hospital, and with knowledge that medical personnel were working upon Kraft, and with no

knowledge of any outward signs of medical distress (aside from the fact of intoxication itself),

should have nonetheless somehow stopped all activity in the room and demanded a medical

screening or treatment (which may well have required a blood draw), would fly in the face of any

reasonable expectation.  The court will not place such unreasonable expectations on law

enforcement officers.

### D. Deliberate Indifference to Plaintiffs' Rights to Familial Association

The first amended complaint alleges that "[b]y committing the violations set forth

in paragraph 48 [claims under 42 U.S.C. § 1983], defendants ... deprived plaintiffs ... of their right

to continued association with Paul Kraft and deprived them of their constitutional right to a

continued familial relationship with Paul Kraft."  (Am. Compl. ¶ 49.)

Because the court finds no excessive force or deliberate indifference on the part of

Atkinson toward Paul Kraft, as a corollary it also finds no violation of plaintiffs' rights to familial

association as a matter of law.  Venerable v. City of Sacramento, 185 F. Supp. 2d 1128, 1131

(E.D. Cal. 2002).

### E. Liability as for the Wrongs of Others

Atkinson argues that the "team liability" concept is not acceptable under 42 U.S.C.

§ 1983.  Plaintiffs argue that he acted as a team with the SLTPD in his position as a sergeant who

was involved in the original huddle outside the hospital, and he is therefore subject to liability as

having been a member of the team.

A plaintiff can not subject an officer to liability merely due to his membership in a group unless there is a showing of individual participation in the unlawful conduct. <u>Jones v. Williams</u>, 297 F.3d 930, 935 (9th Cir. 2002). Here, although Atkinson did participate minimally in the incident at issue, his actions did not constitute participation in *unlawful* conduct as a matter of law. As discussed in the preceding sections, his actions did not constitute excessive force or deliberate indifference.

F. <u>Qualified Immunity</u>

Atkinson argues that this concept applies to his holding down of Kraft's leg while he was on a gurney to protect others because it was not clearly established that an officer could not do so. In regard to the pillow case and the actions of the other officers in subduing Kraft, Atkinson argues that because the force was not lethal, a reasonable officer could have believed these actions were lawful and thus subject to qualified immunity.

Qualified immunity protects government officials from suits seeking civil damages. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" <u>Saucier v. Katz</u>, 533 U.S. 194, 200, 121 S. Ct. 2151, 2156 (quoting <u>Mitchell v.Forsyth</u>, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985)). It provides "'an <u>immunity from suit</u> rather than a mere defense to liability . . . .'" <u>Id.</u> (quoting <u>Mitchell</u>, at 526, 105 S. Ct. at 2815) (emphasis in original).

Two questions determine whether a government official is entitled to qualified immunity. First, the court must determine whether "'[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right.'" <u>Clement v. Gomez</u>, 298 F.3d 898, 903 (9th Cir. 2002), quoting <u>Saucier</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). If the answer is "no," the inquiry ends. <u>Saucier</u>, 533 U.S. at 201, 121 S. Ct. at 2156. If the answer is "yes," the court must next determine "whether the right was clearly established." <u>Id.</u> Unless the law "put the [official] on notice that [his or her] conduct

1   would be clearly unlawful," the official is entitled to qualified immunity.  <u>Saucier</u>, 533 U.S. at

2   202, 121 S. Ct. at 2156-57.  If a reasonable official could have believed his or her conduct was

3   lawful, immunity protects the official.  The concern of the second prong of the immunity inquiry

4   "is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular

5   police conduct. . . ."  <u>Id.</u> at 195, 121 S. Ct. at 2153.  "This standard gives ample room for

6   mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate

7   the law."  <u>Jeffers v. Gomez</u>, 267 F.3d 895, 910 (9th Cir. 2001) (quotations and citations omitted).

8           Moreover, while public officials asserting qualified immunity have the burden of

9   pleading the defense, plaintiff bears the burden of demonstrating the conduct at issue violated a

10   right that was clearly established when the conduct occurred.  <u>Sorrels v. McKee</u>, 290 F.3d 965,

11   969 (9th Cir. 2002).

12          This court has just found that construing the facts in the light most favorable to

13   plaintiffs, Atkinson is entitled to judgment as a matter of law on all federal claims.  Therefore,

14   under the first prong of this analysis, Atkinson did not violate a constitutional right.  The qualified

15   immunity analysis ends at this point.

16          G.  <u>Negligence</u>[7]

17          Plaintiff's Fourth Cause of Action alleges negligence against Atkinson, and hence

18   El Dorado County, on account of negligence.  As discussed previously, the areas of concern are

19   Atkinson's use of force to assist the South Lake Tahoe officers in carrying Kraft into the medical

20   facility and the actions taken inside the medical facility with respect to the blood draw and alleged

21   lack of screening/treatment.

22          Whether an action alleging injury by a police officer sounds in negligence or

23   intentional tort, the breach element requires proof that the officer used unreasonable or excessive

24   force.  <u>Edson v. City of Anaheim</u>, 63 Cal. App. 4th 1269,  1272, 74 Cal. Rptr. 2d 614 (1998).  For

25

26          [7]  Defendants' request to decline to exercise jurisdiction over the state law claims is
denied because those claims can be disposed of in this order.

1   the reasons previously set forth at length, no material facts exist which would preclude summary

2   judgment on this basis.

3          It is true, as plaintiffs assert that liability could attach on a negligence basis if

4   Atkinson committed acts which increased the risk of harm to Kraft, <u>Benavidez v. San Jose Police</u>

5   <u>Dept.</u>, 71 Cal. App. 4th 853, 865, 84 Cal. Rptr. 2d 157, 165 (1999).  Based on the facts outlined in

6   the preceding sections, there is no evidence that the affirmative acts of Atkinson increased the risk

7   of harm to Kraft.

8          Plaintiffs also have a claim of county liability premised on the negligence of

9   Atkinson.  Because Atkinson was not negligent as a matter of law, the county is not liable.

10         Insofar as plaintiffs assert that Atkinson and the County of El Dorado were

11  negligent in terms of not having the blood draw terminated with then ensuing medical

12  screening/treatment, this claim will be discussed in connection with plaintiffs' Fifth Cause of

13  Action which involves the alleged failure to summon medical care.

14         H.  <u>Duty to Summon Medical Care</u>

15         Atkinson argues he did not breach a duty to summon medical care for Kraft

16  because Kraft was not in his custody but in the custody of Officer Lewis or SLTPD, and medical

17  personnel present did not think Kraft needed medical care.  Plaintiffs dispute that Kraft was not in

18  Atkinson's custody.

19         Plaintiffs' dispute is simply an erroneous conclusion drawn from the undisputed

20  facts that Atkinson was present, and assisted another department's officers, *after the arrest had*

21  *long been made*, when on reaching the medical facility premises, Kraft exhibited such conduct

22  that assistance was necessary.  The undersigned cannot conceive of how this places Kraft in

23  Atkinson's "custody."  However, even if the court is wrong in this conclusion, i.e., every police

24  officer on the scene, no matter what that officer's input into a persons' arrest, and no matter how

25  long the person has been in the custody of another department's officers, makes that late-to-the-

26  event officer a custodian of the person arrested, plaintiffs theory is still strained and non-

18

actionable against Atkinson and the County of El Dorado.

The pertinent code section, Cal. Govt. Code § 845.6, states in part:

> Neither a public entity nor a public employee is liable for injury
> proximately caused by the failure of the employee to furnish or
> obtain medical care for a prisoner in his custody; but, except as
> otherwise provided by Sections 855.8 and 856, a public employee,
> and the public entity where the employee is acting within the scope
> of his employment, is liable if the employee knows or has reason to
> know that the prisoner is in need of immediate medical care and he
> fails to take reasonable action to summon such medical care.

Even if Atkinson had a duty under § 845.6, the duty is limited to summoning
immediate medical care.  It does not encompass a duty to provide reasonable or appropriate care.
Watson v. State of California, 21 Cal. App. 4th 836, 841-842, 26 Cal. Rptr. 2d 262, 265 (1993).
Here, Kraft was in a room in the Emergency Department of the hospital, surrounded by medical
staff.  Any duty Atkinson may have had to summon medical care was satisfied.  Furthermore, "the
public employee must know or have reason to know of the need of immediate medical care and
fail to summon such care."  Lucas v. County of Los Angeles, 47 Cal. App. 4th 277, 288, 54 Cal.
Rptr. 2d 655, 663 (1996), citing Watson, 21 Cal. App. 4th at 841-842, 26 Cal. Rptr. 2d at 265.
Here, Atkinson was not in the room when Kraft began to exhibit the need for immediate medical
care and cannot be faulted for any failure to obtain it.  Finally, police officers "do not have the
medical training to know whether a prisoner's medical condition has been properly diagnosed and
treated."  Watson, 21 Cal. App. 4th at 843, 26 Cal. Rptr. 2d at 266.

I.   Interference with Rights Under Cal. Civ. Code 52.1

Cal. Civ. Code § 52.1 provides for a civil action where a person's federal or state
constitutional rights have been violated.  Because the court has found no constitutional violations
by Kraft, summary judgment is granted on this claim.  See Reynolds v. County of San Diego, 84
F.3d 1162, 1170-71 (9th Cir. 1996), overruled on other grounds, Acri v. Varian Associates, Inc.,
114 F.3d 999 (9th Cir. 1997).

\\\\\\

VI. <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

This motion concerns plaintiffs' contention that as a matter of law, Barton acted under color of state law when Kraft was brought to Barton Hospital, and therefore 42 U.S.C. § 1983 applies.[8]  Plaintiffs support this assertion by virtue of a California statute, an agreement between the hospital and SLT Police Department, and the actions of the parties.

As explained in recent cases, "[w]hat is fairly attributable [to state action] is a matter of normative judgment, and the criteria lack rigid simplicity." <u>Brentwood Academy v. Tennessee Secondary School Ath. Assoc.</u>, 531 U.S. 288, 295, 121 S. Ct. 924, 930 (2001).  As discussed recently by the Ninth Circuit:

> Conduct that is actionable under the Fourteenth Amendment as State action is also action under color of State law supporting a suit under § 1983.  <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 935, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).  "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"  <u>Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.</u>, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).
>
> ***
>
> "[No] one fact can function as a necessary condition across the board ... nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason...."  <u>Brentwood</u>, 531 U.S. at 295-96, 121 S.Ct. 924.  Because of the fact-intensive nature of the inquiry, courts have developed a variety of approaches to the State actor issue.  <u>See</u> <u>id.</u> at 296, 121 S.Ct. 924 (listing seven approaches to the issue including the coercion test, the joint action test, the public function test, and the entwinement test).

<u>Lee v. Katz</u>, 276 F.3d 550, 554 (9th Cir. 2002).

The most commonly utilized tests have been described in <u>Cornish v. Correctional Services</u>, 402 F.3d 545, 549–50 (5th Cir. 2005):

\\\\\

---

[8]  This issue is also raised by Barton in its motion for summary judgment.  Both briefings on this issue will be resolved in this section.

The 'public function test' examines whether the private entity performs a function which is 'exclusively reserved to the State.' Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).  Under the 'state compulsion test,' a private actor's conduct is attributable to the State when it exerts coercive power over the private entity or provides significant encouragement. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 170-71, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  The 'nexus' or 'state action test' considers whether the State has inserted 'itself into a position of interdependence with the [private actor, such] that it was a joint participant in the enterprise.  Jackson v. Metro. Edison Co., 419 U.S. 345, 357-58, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); see also Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).  And, under the 'joint action test,' private actors will be considered state actors where they are 'willful participant[s] in joint action with the State or its agents.'  Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

Barton concedes it was a state actor for purposes of the blood draw only.  (Barton's MSJ at 16:18.)  The issue is whether Barton's actions in regard to its role in drawing blood were so intertwined with its duties to screen or treat that it was a state actor for all purposes.  Turning to the factors applicable to a finding that Barton is a state actor in regard to a claim of failure to screen or treat Kraft, it is undisputed that this hospital has been delegated governmental functions. See West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250 (1988) (delegation of government mandated medical treatment) and Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627-628, 111 S. Ct. 2077 (1991) (use of peremptory challenges in a civil action).  California statutes set forth an extensive regulatory scheme governing blood draws by the state.  See Cal. Veh. Code § 23612. For example, pursuant to § 23158(a), only physicians, nurses, phlebotomists, and specified other scientists can draw blood.  Under § 23612(a)(1)(C), blood tests are administered at the direction of a peace officer pursuant to a lawful arrest where the officer has reasonable cause to believe the person was driving a motor vehicle in violation of the law.  Furthermore, regulations contain standards governing collection of blood samples for forensic analysis so that integrity of the samples can be maintained.  17 C.C.R. §§ 1219, 1219.1.  The procedures must be approved by the State Department of Health Services.  Id.  Section 1219.1 outlines specific procedures for collection and retention of blood samples.

1            In addition to this regulatory scheme, the State delegated legal authority to Barton

2 to conduct the blood draw.  The hospital maintains a form which the lab technician gives to the

3 officer to complete.  (Lewis Depo. at 49-50, 53.)  The lab box into which the blood sample is

4 placed is provided by the Department of Justice.  (Lewis Depo. at 55.)  The hospital and the

5 SLTPD have a longstanding relationship in which they have agreed that the police can bring

6 someone into the hospital.  The phlebotomists draws blood for the police, and then bills the police

7 who pays the hospital.  (Muren Depo. at 36.)  Furthermore, staff in this case assisted police by

8 directing them to a designated room where blood draws were normally taken, and assisting

9 officers with the blood draw.  (Wilson Depo. at 76.)  For example, when lab assistant Hudson

10 observed how combative Kraft was, she asked Mary Johnson, her supervisor, what to do.  Johnson

11 responded to go ahead with the blood draw because the police officers were insisting.  (Hudson

12 Depo. at 31:18-32:3.)  Hudson helped restrain Kraft so that he could not hurt the other lab

13 assistant or herself.  (Id. at 64:15-17.)  She tried to hold his hands still so the needle could be

14 inserted, and leaned over a little bit on him with her forearms. (Id. at 64:21-65:4.)

15            The concession by Barton and evidence indicating the hospital was a state actor for

16 a blood draw is inextricably intertwined with the question whether Barton was a state actor for

17 purposes of screening and treatment.  As the recitation of evidence below demonstrates, even

18 though Barton attempted to distinguish its treating role from its blood draw role with its policy not

19 to screen unless specifically asked by police officers, when push came to shove, Barton

20 recognized that it had a duty to diagnose and treat emergent conditions whenever they occurred in

21 the process of a blood draw—the duty for which it was concededly a state actor.

22            According to testimony of the emergency department director at the time, the

23 hospital does not do medical screening of people in police custody who are brought in for blood

24 draws.  (Bittner Depo. at 11.)  Medical screenings are only done by physicians.  Nurses may make

25 a triage decision for individuals brought in for blood draws only where police have expressed to

26 the nurse that the patient needed attention or medical care.  (Id. at 12-13.)  Medical screenings are

also only performed under this condition. (Id.) "Fit for" exams are a medical clearance procedure

to determine if an arrestee is medically able to go to jail. (Id. at 17.) They are also provided by

the hospital only at the request of police. (Id.) If the arrestee requests medical attention, then the

police would request the fit for exam. (Id. at 17-18.) Dr. Schankerman, an emergency room

physician, testified that he has never provided medical care to a person brought in by the police

where the police did not request it; however, he testified that if someone were brought in and

clearly had an emergency, he would treat immediately. (Schankerman Depo. at 31-32.)

Furthermore, he stated that it was hospital policy not to provide medical care to a person in police

custody without a police request. (Id. at 31:9-11.) He explained that he has never experienced a

situation where police did not want him to evaluate a person because the police are "extremely

conservative about that." (Id. at 32:4.) He added: "if I felt that – again, this is a little bit of

speculation, but if the police did not want me to examine a patient, and I wanted to, I cannot

believe the police would somehow deflect me or defer me from examining the patient." (Id. at

32.) See also (Bittner Depo. at 11:12-22) (policy not to do screening exams on patients brought in

for blood draws); (Armour Depo. at 43:14-19) (same); (Wilson Depo. at 48) (policy not to do

triage assessment on individuals brought in for blood draws; however, for a brief time after the

Kraft incident, hospital changed policy to require triage on everyone who came through

Emergency room; policy stopped after consulting with attorney who advised such triage was not

necessary). This testimony is significant because it indicates that the hospital consciously

changed its policy for a short time, but returned to the policy in place at the time of the Kraft

incident which was to refrain from medical screenings on blood draw recipients. Defendant

correctly points out that medical staff would treat an arrestee who they determined needed medical

attention.

      Finally, the facts of this very case demonstrate the inextricable intertwining of

blood draw duties and medical screening/treatment duties. When medical staff recognized a

medical emergency, they did not ask the police officers for permission to call "Code Blue,"– they

just did it.  Although plaintiffs would argue that the recognition of a medical problem came much too late, for purposes of analysis here, clearly the state actor blood draw duties included recognition of, and treatment of emergent medical conditions.

This evidence comports with the analysis undertaken in <u>Jensen v. Lane County</u>, 222 F.3d 570, 574 (9th Cir. 2000), as cited by plaintiffs.  In that case, a private psychiatrist who was affiliated with a private group called Psychiatric Associates was consulted by a mental health specialist employed by the county.  As a result of his review of police and other reports obtained from the county, the psychiatrist signed a detention order which resulted in a five day detention in the county psychiatric hospital.  <u>Id.</u> at 573.  Detention was continued based on these reports and a later exam by the psychiatrist.  <u>Id.</u>  The court found that the private psychiatrist was a state actor, not due to detailed regulation of the psychiatrist or substantial funding, but because the psychiatrist and the county had:

> undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others.  County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals .., and [Psychiatric Associates] helps to develop and maintain the mental health policies of [the county hospital.]

<u>Id.</u> at 575.

The court found that the state had so insinuated itself into the process that there was a close nexus between it and the defendant private psychiatrist such that his actions were treated as those of the state.  <u>Id.</u>

The facts of this case are not unlike those in <u>Stypman v. City and County of San Francisco</u>, 557 F.2d 1338 (9th Cir. 1977), also cited by plaintiffs.  There, a finding of state action was based on the following:

> A police officer makes the initial determination that a car will be towed and summons the towing company.  The towing company tows the vehicle only at the direction of the officer.  The officer designates the garage to which the vehicle will be towed.  The officer notifies the owner that his vehicle has been removed, the

grounds for the action, and the place of storage. The towing
company detains the vehicle and asserts the lien for towing and
storage charges pursuant to a statutory scheme designed solely to
accomplish the state's purpose of enforcing its traffic laws. Thus
the private towing company is a 'willful participant in a joint
activity with the State or its agents.'

Id. at 1341.

The critical distinction, according to Barton, is between the act of drawing blood

and its function as an emergency room. Barton points to Cornish v. Correctional Services Corp.,

402 F.3d 545, 549 (5th Cir. 2005), where a private corporation running a correctional facility was

found to be a state actor only with respect to incarceration, but not with respect to employment

decisions such as terminating plaintiff's employment. As a matter of law, Barton argues that

medical screening or treatment by private medical professionals are not state actions. The court

would agree if Barton's action in this case were terminating an Emergency Room nurse in

retaliation for reporting alleged hospital misconduct in regard to blood draws to the state

authorities, which would be analogous to the factual scenario in Cornish.

Instead, Barton's conduct in regard to its state delegated duties of drawing blood

and providing fit-for and screening exams was much more entangled with the arrest and evidence

gathering process of the SLTPD such that its actions must be treated as those of the state. The

court recognizes that the mere fact that state government regulates blood draws or fit-for exams by

the hospital is insufficient per se to make the regulated entity a state actor for all purposes. See

George v. Pacific-CSC Work Furlough, 91 F.3d 1227 (9th Cir. 1996) (private contractor manager

of a correctional facility was not a state actor in employment matters). Nevertheless, the

additional circumstances, including delegation of legal authority to Barton, longstanding

agreement between Barton and SLTPD and resulting policy and procedures to perform these tests

and exams, actual physical participation in the police efforts to restrain Kraft for blood draw, and

performance of fit-for exam at police request, work in combination to create state action.

Furthermore, the fact that Barton had a policy to conduct a "fit for" exam at the request of police,

and would have been a state actor had it done so, does not cause it to lose its status as a state actor

by virtue of the fact that the police did not request such an exam in this case.  On common law

grounds, Barton's blood draw duties included diagnostic (screening) and treatment functions, and

these common law duties were part and parcel of the blood draw process.

VII.  DEFENDANT BARTON'S MOTION FOR SUMMARY JUDGMENT

          In addition to the issue of state action, Barton's motion is made in regard to the

seventh, eighth and ninth claims for relief, for deliberate indifference to serious medical needs

under 42 U.S.C. § 1983, for violation of a duty to screen under the Emergency Medical Treatment

and Active Labor Act (42 U.S.C. § 1395dd), and violation of a duty to screen under California

Health and Safety Code § 1317, et seq., respectively.  Defendants El Dorado County and

Atkinson, and the South Lake Tahoe defendants do not oppose the motion.

    A.  Duty Under EMTALA

          The EMTALA provides that a hospital must provide an appropriate medical

screening examination or treatment to any individual who comes to its emergency department and

a request for examination or treatment is made by the individual or on that individual's behalf.  42

U.S.C. § 1395dd(a):

> (a) Medical screening requirement
>
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

The requirements to establish a violation are:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical

1   condition, or (b) bade farewell to the patient (whether by turning her
    away, discharging her, or improvidently transferring her) without
2   first stabilizing the emergency medical condition.

3  Correa v. Hospital of San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995).

4          Barton argues that plaintiffs cannot meet the second requirement because neither

5  Kraft nor the police officers requested treatment or examination.  In fact, Barton staff specifically

6  asked the officers whether they were there for a legal blood draw or "fit for" exam, and officers

7  responded, "legal draw only."  As a result, Barton staff assertedly did not think Kraft was in

8  medical distress or need of medical care until he stopped breathing.

9          In regard to the interpretation of a statute by regulations, it is universally

10 acknowledged that legislative intent be first determined from the unambiguous words of the

11 statute itself.  Dept. Of Housing etc. v. Rucker, 535 U.S. 125, 132, 122 S. Ct. 1230, 1234 (2002)

12 ("The Court of Appeals correctly recognized that reference to legislative history is inappropriate

13 when the text of the statute is unambiguous").

14         The word request means: "the act of asking, or expressing a desire, for something;

15 solicitation or petition."  Webster's New World Dictionary, Third College Edition.  Plaintiffs

16 would read this word right out of the statute by, in essence, asserting: "In the case of a hospital

17 that has an emergency department, if any individual...comes to the emergency department, the

18 hospital must provide for an appropriate medical screening...."  Obviously, plaintiffs seek to drop

19 the entire clause concerning a request for treatment, and this simply cannot be done by a court

20 with any respect for the words of the legislation themselves.

21         The undersigned is not saying that a request has to be verbal.  Certainly, types of

22 non-verbal conduct could clearly indicate that a request was being made.  However, as seen

23 above, to simply infer a request from a supposed medical condition, even in a case such as that

24 \\\\\

25 \\\\\

26 \\\\\

1  here where the "patient" is doing everything possible to convey that he does not desire to be at the

2  medical facility, re-writes the statute into one of mere common law medical duties.[9]

3       Nevertheless, the court must address the fact that the agency in charge of

4  administering EMTALA has recently chosen to interpret the legislation in the manner in which

5  plaintiffs request.  And, when an agency speaks, the courts should pay attention to the meaning

6  ascribed to interpretive regulations.  Arrington v. Wong, 237 F.3d 1066, 1071 (9th Cir. 2001)

7  (Administrative agency regulations interpreting the rule 'will often suffice to clarify a standard

8  with an otherwise uncertain scope.'").  In the case of medical screening, the Department of Health

9  and Human Resources has provided that when an individual presents at an emergency department,

10  the hospital must provide "an appropriate medical screening examination" where the individual

11  makes a request for an exam or treatment, a request is made on his or her behalf, or, in the event a

12  request is not made, "if a prudent layperson observer would believe, based on the individual's

13  appearance or behavior, that the individual needs examination or treatment for a medical

14  condition;...."  42 C.F.R. § 489.24.

15       Even expert agencies, however, are not Congress, and cannot change the words of

16  legislation to suit their "better ideas."  Barnhart v. Sigmon Coal Co. Inc., 534 U.S. 438, 440-41,

17  122 S. Ct. 941, 945 (2002) ("The court will not alter unambiguous text in order to satisfy the

18  Commissioner's policy preferences.").  And, it is ultimately the responsibility of the courts, not

19  the agencies, to interpret the words of statutes.  "[W]e accord substantial deference to the

20  interpretation given statutes by the officers or agency charged with their administration ....

21  Nonetheless, the courts are the final authorities on issues of statutory construction."  Central

22

23     [9]  The court understands that in Arrington v. Wong, 237 F.3d 1066 (9th Cir. 2001) found
   ambiguity in the phrase "comes to the emergency department."  The issue there involved whether

24  such a phrase included the transportation to the hospital in a private ambulance.  The Ninth
   Circuit determined that EMTALA should be interpreted broadly to include the transportation

25  scenario especially in light of the regulations issued by the Department of Health and Human
   Services.  However, interpreting a phrase which can reasonably be construed as ambiguous is

26  distinct from simply eradicating a word or phrase from the statute.

1  Montana Elec. v. Admin. of Bonneville Power, 840 F.2d 1476-1477 (9th Cir. 1988).

2          Title 42 U.S.C. § 1395hh authorizes the Secretary of H & HS to "prescribe such

3  regulations as may be necessary to carry out the administration of the insurance programs under

4  this subchapter."  Putting aside the problematic definition of "subchapter," and whether the

5  EMTALA provisions are part of the subchapter (they are part of the same chapter), the regulation

6  changing "request" to also mean "without request" might be construed as a "legislative" rule

7  which has the force and effect of law, see Erringer v. Thompson, 371 F.3d 625, 630 (9th Cir.

8  2004) in which case the standard of review would be "arbitrary and capricious."  Arrington, 237

9  F.3d at 1070.  However, the rule cannot be "legislative" because the agency has no authority to

10  issue a retroactive legislative rule unless the authorizing statute *expressly* authorizes retroactivity.

11  Newman v. Apfel, 223 F.3d 937, 942 (9th Cir. 2000).  No such authorization exists in § 1395hh,

12  and thus, construing the rule as a legislative rule, one could  not apply it to the events in question

13  which predated the rule—which is the case here.

14          At best, even considering the rule to be interpretive (something seemingly at odds

15  with the authorizing language), and thus not subject to a retroactivity proscription, Barona Grp. v.

16  American Manag. & Amusement Co., 824 F.2d 710, 722 (9th Cir. 1987), interpretive rules do not

17  have the force of law, Erringer v. Tompson, supra, and simply define the statute as it always was.

18  The "permissive" standard of review would apply, Arrington, supra.  For the reasons expressed

19  above, the undersigned cannot find the addition of a "without request" provision as permissibly

20  interpreting a statute which expressly required a "request" to be applicable.[10]

21          In this case, the language of the statute, insofar as it requires a request, is clear and

22  certain in scope and requires no explanation of this term.  It requires that an individual presents at

23  _____

24          [10]  This is not to say that a request could not be made with conduct as opposed to words,
    or that any precise words have to be used.  Certainly an ambulance attendant's statement: "this
25  man is hurt, get help" is a request for treatment.  We have no party which asserts that plaintiff
    made any request, verbal or non-verbal for treatment, nor did anyone make a request on his
26  behalf.

1  the emergency department *and* a request for examination or treatment is made.  <u>Arrington</u>, 237

2  F.3d at 1070 (emphasis added). The regulation attempts to rewrite the statute and change its legal

3  significance by eliminating the word "request" and negating this requirement.[11]  In no way does

4  the regulation seek to clarify the construction of the term, but seeks to expand on the statute by

5  negating the request requirement altogether.

6              The Court has tried but it cannot conceive of a realistic situation where a person,

7  who cannot communicate in some verbal or non-verbal fashion for himself, would nevertheless be

8  able to show up at an emergency room, unattended by someone, in order to be screened or

9  treated.[12]  Clearly, such an impaired person would be brought to the hospital by someone, relative,

10  friend, stranger-on-the-street, ambulance attendant, etc.   But the rule suggests that under

11  EMTALA the hospital should treat persons like Kraft, who are attended, as if they have no right to

12  refuse screening and/or treatment.  Strap them down, screen them, take a blood draw or other

13  invasive procedure if necessary for the screening process, and stabilize them. This sounds much

14  like what plaintiffs complain about in the first place.  Perhaps Congress thought about this

15  unlikely scenario and rejected a rule where *no* person consented, or even asked, in some fashion to

16  the screening or other medical procedure.  Perhaps Congress did not think about it at all.

17  Whatever the correct scenario, agencies have no power to rewrite a statute which uses a specific,

18  \\\\\

19  \\\\\

20

---

21       [11]  In fact, there is evidence that Kraft himself did everything he could, by his words and
   actions, to *not* request medical care.  He did not want to present himself at this hospital, and did
22  everything he could to leave.  Plaintiffs' cited case, <u>Evans v. Montgomery Medical Center</u>, 1996
   WL 221526 (E.D. Pa. 1996), although at first glance piques interest, is distinguishable in
23  addition to being non-binding and unpublished.  There, the decedent arrestee was also taken in
   for a blood alcohol test by police; however, he signed a consent to hospital care form.  Here,
24  Kraft signed no such form.

25       [12]  Even a mentally impaired person is not going to show up unattended at a hospital
   emergency room and not be able to make some intimation that he or she would like treatment of
26  some sort.

1    required term, or negate the use of a term used, under the guise of "interpretation."[13]

2              Finally, although resort to legislative history is inappropriate and unnecessary, even

3    it does not favor plaintiffs' position.  EMTALA, commonly known as the Patient Anti-Dumping

4    Act, was enacted by Congress to respond to the specific problem of hospital emergency rooms

5    refusing to treat uninsured patients or those who could otherwise not pay for treatment.  Baker v.

6    Adventist Health, Inc., 260 F.3d 987, 993 (9th Cir. 2001). Before its enactment, emergency rooms

7    would either decline to provide treatment or transfer medically unstable patients to other hospitals,

8    thereby jeopardizing the patient's health.  According to the legislative history of the Act, Congress

9    intended to prevent hospitals from refusing to treat or from dumping patients who lack insurance

10   coverage.  See H.R.Rep. No. 241, 99th Cong., 2d Sess., 27, reprinted in 1986 U.S.C.C.A.N. 42,

11   605; Note, *Preventing Patient Dumping*, 61 N.Y.U.L.Rev. 1186, 1187-88 (1986).  It is well

12   established that EMTALA is not a remedy for claims of medical negligence, failure to treat, or

13   deliberate indifference.  See Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258 (9th Cir.1995)

14   (Congress did not enact EMTALA to improve overall standard of medical care).  Claims of failure

15   to treat or improper treatment, such as those asserted by plaintiffs here, remain the exclusive

16   province of either negligence under state law or deliberate indifference under federal law.

17            Here, there was no issue whatsoever concerning whether Kraft was unable to pay

18   for services and that the hospital did not want to treat him as a result.  There was also undisputed

19   evidence that Barton would, if requested, screen or treat Kraft.  In fact, hospital staff asked police

20   whether they should perform a "fit for" exam.  (Dunn Depo. at 14:4-15:11.)  Requiring a hospital

21   to do more than this without a request would lead to a result not intended.  The court finds that

22

23            [13]As will be seen however, this does not mean that medical personnel at a hospital should
     not inquire, or even press their inquiry about treatment, under common law or constitutional
24   directives.  However, if there is such liability, it cannot be found under EMTALA in that nothing
     in the statute requires hospital personnel to inquire, repeatedly inquire, plead, beg, remonstrate or
25   the like in order to persuade a person to be screened or treated, or to persuade that person's
     attendant.  The statute, and that is what is being interpreted here, places the burden of a request
26   on non-hospital personnel.

1    EMTALA is not applicable to this case, insofar as no request for treatment was made by anyone.

2        B. Duty Under Cal. Health and Safety Code § 1317, et seq.

3            California Health and Safety Code § 1317 provides in part:

4            (a) Emergency services and care shall be provided to any person
             *requesting* the services or care, or for whom services or care is
5            *requested*, for any condition in which the person is in danger of loss
             of life, or serious injury or illness, at any health facility licensed
6            under this chapter that maintains and operates an emergency
             department to provide emergency services to the public when the
7            health facility has appropriate facilities and qualified personnel
             available to provide the services or care.

8

9    Cal. Health & Safety Code § 1317 (emphasis added).

10            This state code section is analogous to EMTALA.  Baker v. Adventist Health, 260

11   F.3d 987, 995 (9th Cir. 2001).  For the reasons stated above, Barton's motion for summary

12   judgment is granted on this claim.

13        C. 42 U.S.C. § 1983

14            Having found that Barton was a state actor in regard to plaintiffs' motion for partial

15   summary judgment, the issue is whether the hospital was deliberately indifferent to Kraft's

16   medical needs as a matter of law.  The standards regarding this issue have been set forth in

17   conjunction with a similar claim against defendants El Dorado and Atkinson in Section V.C.

18   *supra*.

19            Plaintiffs argument is twofold.  First, they claim that Barton's policy to not screen

20   or treat individuals in custody unless requested by police amounts to deliberate indifference

21   because such a restraint on the arrestee's ability to act on his own behalf violates substantive due

22   process.  Second, they claim that the actions of Barton's staff were deliberately indifferent, in any

23   event.

24            1. Barton's Policy

25            The seventh claim for relief in the first amended complaint alleges that Barton had

26   a policy not to screen arrestees brought in by police unless requested by police, that police did not

                                                    32

1  request a screening in this instance, and that in accordance with Barton's policy, a screening was

2  not performed on Kraft until after he went into cardiac arrest.  Am. Compl. at ¶¶ 70-72.

> A defendant cannot be held liable under section 1983 on a
> respondeat superior or vicarious liability basis.  Monell v.
> Department of Social Serv., 436 U.S. 658, 98 S.Ct. 2018, 56
> L.Ed.2d 611 (1978).  Monell involved a municipal corporation, but
> every circuit court to consider the issue has extended the holding to
> private corporations as well.

7  Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir. 1992) (citations omitted).  See also Buckner v.

8  Toro, 116 F.3d 450, 452 (11th Cir. 1997) (affirming that Monell applies to private entity which

9  acts as equivalent of  municipality); Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408-09

10  (2d Cir. 1990) (department store not liable for manager's detention of customers without probable

11  cause unless it had a policy to arrest on less than probable cause); Robinson v. City of San

12  Bernardino Police Department, 992 F. Supp. 1198, 1204 (C.D. Cal. 1998) (citing cases outside

13  Ninth Circuit).  In Harvey, the court held that the hospital could not be held liable for the acts of

14  the hospital's employees.  Id. at 1130.  Municipal corporations, or those private persons or entities

15  acting on behalf of the state, are viewed as "persons" under section 1983.  Hampton International

16  Communications, Inc. v. Las Vegas Convention and Visitors Authority, 913 F. Supp. 1402, 1407

17  (D. Nev. 1996); Moore v. Wyoming Medical Center, 825 F. Supp. 1531, 1543, n. 8 (D. Wyo.

18  1993) (mentioning that arguably a private corporation acting as a municipality is not an individual

19  but is in effect the municipality).

20        The general rules applicable to counties and municipalities provide that since there

21  is no respondeat superior liability under § 1983, these entities may be sued under § 1983 only

22  upon a showing that an official policy or custom caused the constitutional tort.  See Mt Healthy

23  City School Dist Board of Education v. Doyle, 429 U.S. 274, 280, 97 S. Ct. 568 (1977); Monell v.

24  New York City Dep't of Social Services, 436 U.S. 658, 691, 98 S. Ct. 2018 (1978).  "A local

25  government entity cannot be held liable under § 1983 unless the plaintiff alleges that the action

26  inflicting injury flowed from either an explicitly adopted or a tacitly authorized [governmental]

1   policy." <u>Ortez v. Washington Cty., State of Or.</u>, 88 F.3d 804, 811 (9th Cir.1996) (citation and

2   quotations omitted) (alteration in original) "[L]ocal governments, like any other § 1983 'person,'

3   ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even

4   though such a custom has not received formal approval through the body's official

5   decisionmaking channels." <u>Monell</u>, 436 U.S. at 690-91.

6          A § 1983 claim against a municipality or entity requires that a plaintiff establish (1)

7   deprivation of a constitutional right;  (2) a policy by the county or entity;  (3) the policy

8   constituted deliberate indifference to plaintiff's constitutional right;  and (4) the policy was the

9   "moving force behind the constitutional violation." <u>Mabe v. San Bernardino County, Department</u>

10  <u>of Public Social Services</u>, 237 F.3d 1101, 11110-11 (9th Cir. 2001) (quoting <u>Van Ort v. Estate of</u>

11  <u>Stanewich</u>, 92 F.3d 831, 835 (9th Cir.1996)).

12         Assuming for purposes of element number one that Barton had such a policy to not

13  screen arrestees unless requested by law enforcement, such a policy could constitute deliberate

14  indifference.  Plaintiffs have submitted evidence that Barton had such a policy.  Dr. Schankerman

15  testified that it was hospital policy not to provide medical care to a person in police custody

16  without a police request.  (Schankerman Depo. at 31:9-11.)  <u>See</u> <u>also</u> (Bittner Depo. at 11:12-22)

17  (policy not to do screening exams on patients brought in for blood draws); (Armour Depo. at

18  43:14-19) (same);(Wilson Depo. at 48) (policy not to do triage assessment on individuals brought

19  in for blood draws; however, for a brief time after the Kraft incident, hospital changed policy to

20  require triage on everyone who came through Emergency room; policy stopped after consulting

21  with attorney who advised such triage was not necessary).  Defendant objects to plaintiffs' dispute

22  over its undisputed fact contention that it treats individuals in the emergency room perceived to be

23  in need of medical attention, despite any failure to request screening or treatment.  (Bittner Decl.

24  at 2:24 - 3:3.); (Schankerman Depo. at 31-32.)  If this contention is part of its policy, then

25  Barton's policy does not necessarily amount to deliberate indifference, but raises a question of

26  fact as to the terms of the policy.

1    The depositions of nurses Armour and Burkart are examples of the questions of

2 fact surrounding the hospital's policy.  Armour's testimony was that she was not aware of a

3 specific policy addressing the situation where an arrestee is brought in by police for a fit-for exam

4 or blood draw but appears to be ill.  (Armour Depo. at 45, 63-64.)  Plaintiffs cite to Nurse

5 Burkart's deposition testimony for the proposition that the hospital does not make the screening

6 decision, but that police does.  Defendant argues that the same deposition testimony merely

7 describes how police use the hospital facility for legal blood draws.  Burkart testified:

8    A.  After he was brought into the emergency room, I did not have

9    contact with him.  He was taken to Room 5, which is our standard

10    room for legal BAs, and I was taking care of other patients.  He did

11    not need nursing care.

12    Q. And what makes you say he did not need nursing care?

13    A.  He was there for a legal BA, which is standard procedure, and

14    that does not include any nursing intervention.

15 (Burkart Depo. at 17:14-23.)

16    Elsewhere, Burkart testified that her understanding regarding legal blood draws is

17 that they do not include any nursing intervention because the police are just using the facility.  (Id.

18 at 53:5-10.)  She stated that she has never done a medical assessment for a legal blood draw when

19 she was not asked to do so by a police officer.  The practice of emergency room staff was to wait

20 and see whether the officer asked her to do an assessment.  (Id. at 53:16-25.)

21    Armour's deposition, on the other hand, indicates that she did not know of any

22 specific policy in regard to a situation where an arrestee is brought in by police and appears to be

23 ill, and that she has not been present when such a situation occurred.  (Armour Depo. at 45:2-6;

24 45:7-9.)  Armour also testified, however, that she did know of a policy where police bring in

25 individuals who need medical attention for legal blood draws:

26 \\\\\\

1    Q.  Do you know if the hospital has any policies that are either

2    formal or informal about police officers bringing people in for legal

3    blood draws?

4    A.  The policy I am aware of is that unless they need medical

5    clearance, we don't register them and do a screening exam.

6    Q.  What's medical clearance?

7    A.  I could probably best just give you an example.  If an individual

8    says they have a medical problem, typically the officers will have a

9    screening exam to make sure that they are fit to go to jail.

10   Q.  Is this what's known as a "fit for"?

11   A.  Yes.

12   Q.  But unless you, someone in the hospital has been told that they

13   need a "fit for examination," the patient does not get any medical

14   examination at all?

15   A.  Correct.

16   ...

17   Q.  Is there ... Does the Barton ER have a policy for what to do if

18   someone brought in by police officers appears to be ill?

19   A.  I don't know of any specific policy regarding that.

20   (Armour Depo. at 43-45.)

21           Although nurse Bittner's testimony also speaks to staff policy not to make a triage

22   decision or perform screenings unless police requests are made, defendants point out that this

23   policy does not apply to the situation where staff perceive a medical necessity.  Dr.

24   Schankerman's testimony supports defendant's version of the facts:

25   Q.  I'm asking about the policy, where the policy's --

26   A.  I guess I don't have a clear understanding of the question.  If

                                        36

1    someone's brought in and clearly has an emergency, I would

2    certainly treat them immediately.  I've certainly never been in the

3    situation where the police do not want me to evaluate a patient.

4    They're extremely conservative about that.

5    (Schankerman Depo. at 31-32.)

6         Elsewhere in his deposition, however, Schankerman testified that he would not

7    provide medical treatment on someone brought in by police for a legal blood draw:

8    Q.  Have you ever had to provide medical treatment for somebody

9    who was brought in for a legal blood draw by the police?

10    A.  There's no possibility of that because unless they are – unless

11    the police request a medical evaluation, I would have no

12    involvement with the patient or subject.

13    (Id. at 29-20.)

14        Based on the aforementioned testimony as well as the testimony of other Barton

15    staff, it is unclear what, if any, policy existed in regard to screening or treating individuals brought

16    in by police who were in need of medical care despite being brought in for blood draws, and

17    therefore a dispute of fact exists as to the nature of the policy and whether it amounted to

18    deliberate indifference to plaintiffs' constitutional rights, as well as whether it was the "moving

19    force behind the constitutional violation."  Barton's motion for summary judgment is denied in

20    regard to whether it had a policy which constituted deliberate indifference.

21    \\\\\

22    \\\\\

23    \\\\\

24    \\\\\

25    \\\\\

26    \\\\\

1      2.  Whether Actions of Barton Constituted Deliberate Indifference as a Matter of

2      Law[14]

3          The record is disputed as to whether the actions of hospital staff were deliberately

4  indifferent to Kraft's needs.  There are lay witnesses who did not think Kraft needed medical

5  assistance at the scene of the car accident and on arrival at the hospital.  (Moulton Depo. at 17:12-

6  16, 28:20-25.) (Kraft's eyes were shifty and appeared to be hallucinating but no other

7  abnormalities were apparent from his physical appearance.)  Police officer witnesses testified that

8  Kraft was combative, and that they had to struggle to put him on a gurney.  (Wilson Depo. at

9  20.)[15]  At the entrance to the emergency room, the parties dispute whether Kraft was combative or

10 merely uncooperative.  Barton states that at no time did emergency room staff infer from Kraft's

11 actions that he was in need of medical care.  Officer Gentle testified that while Kraft was in the

12 back seat of the police vehicle, he was yelling and kicking the passenger door so hard that the car

13 was shaking a couple of inches.  (Gentle Depo. at 85-86.)  Emergency room technician Weaver

14 testified that while Kraft was on the gurney between the emergency room and room 5, Kraft did

15 not appear to be in respiratory distress or cardiac distress, or at risk of same.  His color looked

16 good.  (Weaver Depo. at 71-72.)  Nurse Wilson testified, on the other hand, that in her 19 years at

17 Barton Hospital, she had never seen someone come in for a blood draw who was as out of control,

18 combative or wild as he was.  (Wilson Depo. at 88-89.)

19 \\\\\\

20

21      [14]  Barton does not claim that as an entity it could not be liable for the acts of its
   employees, as opposed to a policy which is put into effect.  Barton does not claim that § 1983
22 private entities should be treated as federal private entities in Bivens claims, see Corr. Services
   Corp. V. Maleski, 534 U.S. 61, 122 S. Ct. 515 (2001), and probably correctly so.
23
24      [15]  It is interesting to note that plaintiffs dispute this fact, claiming he was merely
   uncooperative.  Their own experts, however, relied on Kraft's agitated demeanor in forming their
25 opinions.  Dr. Herrmann notes that Kraft was yelling profanities and screaming as he was being
   wheeled into the emergency room, that he was extremely agitated and yelling and moving about,
26 and that it took four officers to hold him down on the gurney.  Herrmann Decl. and attachment at
   2.

1    Barton objects to the declarations of plaintiffs' experts, Drs. Paul Herrmann and

2   Benjamin Lerman, because the declarations state only that the attached Rule 26(a) opinions are

3   true and correct copies, but that the declarations should contain their opinion testimony under

4   penalty of perjury.  The declarations as submitted are sufficient for purposes of summary

5   judgment.

6    Barton also objects that the reports contain hearsay information and irrelevant

7   conclusions.  After reviewing the declarations and attached reports, the court determines that

8   Barton's objections are overruled.  These opinions raise disputes of fact over the care given by the

9   hospital and whether it was deliberately indifferent.  Dr. Herrmann's opinion states that he

10   disagrees with the coroner's statement of cause of death as limited to excited delirium associated

11   with cocaine intoxication.  (Hermann Decl. and attachment, at 3.)  He states that the bad effects of

12   the cocaine intoxication were aggravated by the handling of Kraft which caused him to struggle

13   more and resulted in increased oxygen demand.  (Id. at 4.)  Impeding his breathing caused oxygen

14   deprivation which can result in cardiac arrest.  Herrmann states that hospital staff are expected to

15   be aware of the critical nature of drug intoxication.  (Id. at 5.)

16    Lerman's report states that his drug induced state on arrival at the emergency room

17   should have prompted police and medical personnel who witnessed it to request a screening exam.

18   (Lerman Decl. and attachment at 2.)  Kraft should have been sedated.  (Id.)  He states that the

19   police restraints including the pillowcase on his head, interfered with his oxygen intake and

20   prevented personnel from observing his discoloration due to lack of oxygen.  (Id. at 3.)  If Kraft

21   had been treated on arrival, he more than likely would have survived.  (Id.)  If he had been left

22   unmolested at a minimum without any medical care, there was an excellent chance, according to

23   Lerman, that he would have metabolized his cocaine without suffering cardiac arrest.  (Id.)

24    Based on these disputes of fact, Barton's motion for summary judgment in regard

25   to claims of deliberate indifference, both as to Barton's policies and actions, is denied.

26   \\\\\

1    CONCLUSION

2            For the reasons stated within this opinion, IT IS ORDERED that:

3            1.  Defendants El Dorado County and Atkinson's motion for summary judgment,

4    filed June 23, 2005, is granted;

5            2.  Plaintiffs' motion for partial summary judgment, filed June 20, 2005, is granted;

6            3.  Defendant Barton's motion for summary judgment, filed June 23, 2005, is

7    granted in part and denied in part.

8            4.  Plaintiffs' motion to exclude at trial testimony of expert Don Cameron, filed

9    June 20, 2005, is vacated from the calendar.

10   DATED: 8/24/05

                                        /s/ Gregory G. Hollows
11                                      _____

12                                      GREGORY G. HOLLOWS
                                        U. S. MAGISTRATE JUDGE
13   GGH/076
     Kraft0129.mtn
14

15

16

17

18

19

20

21

22

23

24

25

26

                                        40